## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| DIVERSIFIED MERCURY COMMUNICATIONS, LLC, *et al.*,[1] | Case No. 19-10757-KBO (Jointly Administered) |
| Debtors. | |
| GEORGE L. MILLER, solely in his capacity as chapter 7 trustee of Diversified Mercury Communications, LLC and DTR Advertising, Inc., | |
| Plaintiff, | Adv. Proc. No. 21-50249-KBO |
| v. | Re: D.I. 1 & 12 |
| DIRECT RESULTS RADIO INC., | |
| Defendant. | |

### PRETRIAL BRIEF OF PLAINTIFF GEORGE L. MILLER, CHAPTER 7 TRUSTEE

Dated:  August 19, 2022

ARCHER & GREINER, P.C.
David W. Carickhoff (No. 3715)
Bryan J. Hall (No. 6285)
300 Delaware Ave., Suite 1100
Wilmington, DE 19801
(302) 777-4350
(302) 777-4352 (fax)
dcarickhoff@archerlaw.com
bjhall@archerlaw.com

*Attorneys for the Chapter 7 Trustee*

---

[1] The Debtors in these cases are: (i) Diversified Mercury Communications, LLC a/k/a Mercury Media and (ii) DTR Advertising, Inc.

**TABLE OF CONTENTS**

**Page(s)**

Table of Authorities ............................................................................................................. ii

I.    Plaintiff Has Met His Prima Facie Burden to Avoid and Recover the Transfer...................3

II.   Direct Results Cannot Establish an Affirmative Defense...................................................7

A.    Defendant Cannot Establish a Conduit Defense..................................................................7

B.    The Transfer Was Not Made in the Ordinary Course of Business. ....................................9

      1.    Defendant Fails the Subjective Test under Section 547(c)(2)(A)................................9

            a.    The Transfer Was Made Outside the Historical Range. ......................................10

            b.    Defendant Pressured DMC and Took Advantage of its Financial
                  Condition...........................................................................................................14

      2.    Defendant Fails the Objective Test under Section 547(c)(2)(B). ...............................17

      3.    Defendant's Appeal to Equity Rings Hollow Given Its Own Inequitable
            Conduct. ...........................................................................................................18

III.  CONCLUSION.................................................................................................................20

i

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re 360networks (USA) Inc.*,
   338 B.R. 194 (Bankr. S.D.N.Y. 2005) ...................................................................................14

*In re AE Liquidation, Inc.*,
   No. 08-13031 (MFW), 2013 WL 3778141 (Bankr. D. Del. July 17, 2013) ...........................14

*In re AFA Inv., Inc.*,
   No. 12-11127, 2016 WL 908212 (Bankr. D. Del. Mar. 9, 2016) .......................................9, 10

*AFD Fund, et al. v. Transmed Foods, Inc. (In re AmeriServe Foods Distrib., Inc.)*,
   315 B.R. 24 (Bankr. D. Del. 2004) .........................................................................................6

*Argus Mgmt. Grp. v. Gab Robins, Inc. (In re CVEO Corp.)*,
   327 B.R. 210 (Bankr. D. Del. 2005) .......................................................................................4

*Barnhill v. Johnson*,
   503 U.S. 393 (1992)....................................................................................................11, 12

*Begier v. I.R.S.*,
   496 U.S. 53 (1990)..............................................................................................................3

*Braniff Airways, Inc. v. Midwest Corp.*,
   873 F.2d 805 (5th Cir. 1989) ...............................................................................................12

*Bright v. United States*,
   926 F.2d 383 (5th Cir. 1991) ...............................................................................................19

*Claybrook v. Consol. Foods, Inc. (In re Bake-Line Grp., LLC)*,
   359 B.R. 566 (Bankr. D. Del. 2007) .......................................................................................4

*In re Continental Commodities, Inc.*,
   841 F.2d 527 (4th Cir. 1988) ...........................................................................................12, 13

*Fiber Lite Corp. v. Molded Acoustical Products, Inc.*
   *(In re Molded Acoustical Products, Inc.)*, 18 F. 3d 217 (3d Cir. 1994)...............................5, 17

*Glinka v. Bank of Vermont (In re Kilton Motors, Inc.)*,
   97 F.3d 22 (2d Cir. 1996)....................................................................................................3

*In re Hayes Lemmerz Int'l, Inc.*,
   329 B.R. 136 (Bankr. D. Del. 2005) .......................................................................................8

*Law v. Siegel*,
    571 U.S. 415 (2014)...................................................................................................18

*In re Lenox Healthcare, Inc.*,
    343 B.R. 96 (Bankr. D. Del. 2006) .........................................................................8

*Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.)*,
    281 B.R. 535 (Bankr. D. Del. 2002) ....................................................................5, 6

*McColley v. Navaro Gem Ltd.*,
    68 B.R. 588 (Bankr. S.D.N.Y. 1986) ...................................................................5, 6

*Millard v. Comm'r*,
    T.C. Memo 2005-192, 2005 WL 2078496 (U.S. Tax Court 2005) .................................19, 20

*O'Neill v. Nestle Libbys P.R., Inc.*,
    729 F.2d 35 (1st Cir. 1984)...................................................................................12

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945)..........................................................................................18, 19

*In re Quebecor World (USA), Inc.*,
    491 B.R. 363 (Bankr. S.D.N.Y. 2013)....................................................................10

*In re S. Indus. Banking Corp.*,
    92 B.R. 297 (Bankr. E.D. Tenn. 1988) .............................................................12, 13

*In re TWA, Inc. Post Confirmation Est.*,
    327 B.R. 706 (Bankr. D. Del. 2005) .......................................................................10

*U.S. Interactive v. Sampson Travel Agency, Inc. (In re U.S. Interactive)*,
    321 B.R. 388 (Bankr. D. Del. 2005) ....................................................................8, 17

*Union Bank v. Wolas*,
    502 U.S. 151 (1991)..............................................................................................3

*Waslow v. Interpublic Grp. of Cos. (In re M Grp., Inc.)*,
    308 B.R. 697 (Bankr. D. Del. 2004) ....................................................................3, 5

*In re White River Corp.*,
    799 F.2d 631 (10th Cir. 1986) ..........................................................................12, 13

*In re Wolf & Vine*,
    825 F.2d 197 (9th Cir. 1987) ...........................................................................12, 13

*Young v. Nadelson Displays, Inc. (In the Matter of Lucasa Int'l, Ltd.)*,
    14 B.R. 980 (Bankr. S.D.N.Y. 1981).....................................................................6

**Federal Statutes**

11 U.S.C. § 101(5)(A)........................................................................................................4

11 U.S.C. § 101(10)(A)....................................................................................................4, 5

11 U.S.C. § 101(54) ...........................................................................................................8

11 U.S.C. § 105(a) ...........................................................................................................18

11 U.S.C. § 547 ..............................................................................................................2, 3

11 U.S.C. § 547(b) ..................................................................................................... *passim*

11 U.S.C. § 547(b)(1) ......................................................................................................4, 5

11 U.S.C. § 547(b)(2) .........................................................................................................5

11 U.S.C. § 547(b)(3) .........................................................................................................6

11 U.S.C. § 547(b)(4) .........................................................................................................6

11 U.S.C. § 547(b)(5) .........................................................................................................6

11 U.S.C. § 547(c) ................................................................................................11, 12, 18

11 U.S.C. § 547(c)(2).................................................................................................9, 11, 12

11 U.S.C. § 547(c)(2)(A) .....................................................................................................9

11 U.S.C. § 547(c)(2)(B) ........................................................................................9, 17, 18

11 U.S.C. § 547(f).............................................................................................................5, 6

11 U.S.C. § 547(g) ...................................................................................................7, 9, 17

11 U.S.C. § 550..............................................................................................................1, 2, 7

11 U.S.C. § 550(a) ...........................................................................................................20

11 U.S.C. § 550(a)(1).........................................................................................................7

26 U.S.C. § 451(a) ...........................................................................................................19

**State Statutes**

U.C.C. § 3-503(2) .............................................................................................................12

**Regulations**

26 C.F.R. § 1.451-2.................................................................................................................19

**Other Authorities**

Black's Law Dictionary 1165 (8th ed. 2004)................................................................................4

George L. Miller, solely in his capacity as the chapter 7 trustee ("Trustee") of Diversified Mercury Communications, LLC ("DMC") and DTR Advertising, Inc. ("DTR" and, together with DMC, "Debtors" or "Mercury Media"), submits this pretrial brief in advance of the trial scheduled for on November 9, 2022 in the above-captioned adversary proceeding against Defendant Direct Results Radio Inc. ("Defendant"), and respectfully states as follows:

## INTRODUCTION

This is a textbook preference. In the months before their bankruptcy, the Debtors were running out of cash. Creditors were being stretched or their claims went unpaid. More than $15 million in unpaid claims have been filed against the estates, and creditors are currently projected to recover approximately 20% of what they are owed. Within the preference period, Debtor DMC made a $493,349.34 transfer (the "Transfer") to Defendant in payment of Defendant's Invoice (defined below) at a time when Defendant was a creditor of the Debtor. The Transfer enabled Defendant to receive far more than it would have if the Transfer had not been made. There is no real dispute that the Trustee has established a prima facie case to avoid and recover the $493,349.34 Transfer under sections 547(b) and 550 of the Bankruptcy Code.

Defendant advances several affirmative defenses, none of which has any basis in fact or law. Defendant claims it only kept $19,500 of the Transfer as its commission and that the rest of the money went to pay broadcasters. However, Defendant admits it paid these broadcasters before it received the Transfer. Defendant also had dominion and control over the Transfer. Therefore, Defendant cannot establish a conduit defense.

Defendant argues the Transfer was made in the ordinary course of business. But the Transfer was anything but ordinary. First, Defendant pressured DMC to issue the Check (defined below). Then, Defendant sat on the Check for more than 30 days, it says, "for financial

management and tax purposes" – in other words, to avoid paying taxes on the money in 2018. That fact alone renders the Transfer not ordinary.  And because Defendant held the Check for more than 30 days, it is the Check clear date, not the date on which Defendant received the check, that controls.  The Transfer was made 130 days after the date of the Invoice (defined below), far outside the historical range of payments of 64 days to 96 days to pay.

In advancing its ordinary course defense, Defendant asks this Court (i) to ignore the dates listed on its invoices; (ii) to instead use the dates on which the invoices were allegedly sent to DMC; and (iii) to ignore the fact that Defendant intentionally sat on the Check for more than a month for an improper purpose.  If ever a transfer was not ordinary, this Transfer is it.

As a last resort, Defendant asks the Court to exercise its equitable powers to not order Defendant to return the Transfer.  But general equitable powers cannot be used to disregard the clear and express terms of Bankruptcy Code sections 547 and 550.  And because Defendant pressured DMC to cut the Check and then strategically timed the deposit to avoid paying taxes, Defendant is not entitled to equitable relief.

For the reasons set forth more fully below, and as the evidence at trial will show, the Trustee is entitled to the entry of a judgment against Defendant avoiding and recovering the Transfer in the amount of $493,349.34, together with costs and pre- and post-judgment interest.

## FACTUAL BACKGROUND

For the relevant facts necessary to decide this matter, the Trustee respectfully refers the Court to the Joint Statement of Undisputed Facts and Factual Disputes [D.I. 38] ("Stip.") and the joint exhibits thereto, copies of which are annexed hereto, and to the Complaint ("Compl.," Exhibit P-1 hereto), Defendant's discovery responses (Exhibits P-2, P-3, and P-4 hereto), and to the other exhibits attached to this Brief and as may be presented at trial.

## **ARGUMENT**

**I.      Plaintiff Has Met His Prima Facie Burden to Avoid and Recover the Transfer.**

Section 547 of the Bankruptcy Code permits the avoidance of any transfer that:  (1) was "of an interest of the debtor in property"; (2) was made "to or for the benefit of a creditor"; (3) was "for or on account of an antecedent debt owed by the debtor before such transfer was made"; (4) was "made while the debtor was insolvent"; (5) was made "on or within ninety (90) days before" the petition date; and (6) "enables such creditor to receive more than such creditor would receive if—(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."  11 U.S.C. § 547(b); *Union Bank v. Wolas*, 502 U.S.  151, 154-55 (1991); *Waslow v. Interpublic Grp. of Cos. (In re M Grp., Inc.)*, 308 B.R. 697, 700 (Bankr. D. Del. 2004).  Each of the above-listed elements is satisfied here.

(1)      While the Bankruptcy Code does not define "an interest of the debtor in property," courts have interpreted the term to mean property that would have been part of the bankruptcy estate had it not been transferred before commencement of bankruptcy.  *See Glinka v. Bank of Vermont (In re Kilton Motors, Inc.)*, 97 F.3d 22, 25 (2d Cir. 1996) (citing *Begier v. I.R.S.*, 496 U.S. 53 (1990)).

Here, the Transfer was of an interest of DMC in property as it was made from DMC's own bank account.  *See* Stip. ¶ 11; *see also* Exhibit P-5 hereto (Debtor's bank statement reflecting the Transfer).  Further, Defendant acknowledged the Transfer was of an interest of the Debtors in property.  *See* Defendant Direct Results Radio, Inc.'s Response to Plaintiff's First Set of Requests For Admissions ("Admissions," Exhibit P-2 hereto), Admission No. 7.

(2)      The Bankruptcy Code defines the term "creditor" to include an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the

3

debtor." 11 U.S.C. § 101(10)(A). "Claim" is defined as a "right to payment" (11 U.S.C. § 101(5)(A) and "payment" is defined as "performance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation." *Claybrook v. Consol. Foods, Inc. (In re Bake-Line Grp., LLC)*, 359 B.R. 566, 577 (Bankr. D. Del. 2007) (quoting Black's Law Dictionary 1165 (8th ed. 2004)). Notably, the section 547(b)(1) "requirement has been loosely construed by the courts." *Argus Mgmt. Grp. v. Gab Robins, Inc. (In re CVEO Corp.)*, 327 B.R. 210, 214 (Bankr. D. Del. 2005).

Here, the Transfer was made both "to" and "for the benefit" of Defendant at a time when Defendant was a "creditor" of the Debtor.

Defendant was a creditor of the Debtor at the time of the Transfer. Attached to the Stip. as Exhibit J-2 is a copy of Defendant's Invoice, which was paid by the Transfer. The Invoice is dated "8/26/2018" and the services are described as "Radio Post – 08/01-08/31." *See* Ex. J-2. The Transfer was made (i.e., cleared Defendant's bank account) on January 3, 2019. *See* Ex. P-2, Admission No. 5. Defendant also admits that, prior to and at the time of the Transfer, Defendant was a creditor of the Debtors. *See* Ex. P-2, Admission No. 9.

The Transfer was made "to" Defendant. Defendant admits that it received the Check on December 3, 2018, that it deposited the Check into Defendant's own account on January 2, 2019, and that the Check cleared Defendant's account on January 3, 2019. *See* Stip. ¶¶ 12, 13, 14. Defendant also admits it was the "initial transferee of the Transfer." Ex. P-2, Admission No. 6.

Defendant attempts to argue that "only a very small portion (3.5% totaling $19,510.99) of the Transfer was to or for the benefit of Defendant." Ex. P-2, Admission No. 8; *see* Stip. ¶ 20. However, Defendants' other admissions make clear that the Transfer was for its benefit. Specifically, "Defendant admits that it paid the underlying third party broadcasters after receiving,

4

**but prior to depositing the Check**." Ex. P-2, Admission No. 35 (emphasis added). Because Defendant already had paid the broadcasters before the Check was deposited and cleared—and the Transfer was made—the Transfer was for the benefit of Defendant, and no one else.

In any event, Defendant has admitted that the Transfer was "to" Defendant and at a time when Defendant was a creditor, and section 547(b)(1) is satisfied.

(3)      Similarly, section 547(b)(2) is satisfied, as Defendant has admitted that the Transfer was "for or on account of an antecedent debt" owed by the Debtors to Defendant before the Transfer was made. 11 U.S.C. § 547(b)(2); *see* Ex. P-2, Admission No. 10. Further, as discussed above, the Transfer was in payment of Defendant's own Invoice, which was issued on Defendant's letterhead and which lists Defendant's payment instructions, to which payment was made. *See* Ex. J-2; Stip. ¶¶ 12, 13, 14; Ex. P-2, Admissions No. 3, 4 & 5.

(4)      The Transfer was made at a time when DMC was insolvent. Pursuant to section 547(f) of the Bankruptcy Code, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." *See* 11 U.S.C. § 547(f); *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F. 3d 217, 221 n. 4 (3d Cir. 1994); *Waslow v. The Interpublic Grp. of Cos., Inc. (In re M Grp., Inc.)*, 308 B.R. 697, 700 (D. Del. 2004) ("Debtors are presumed to have been insolvent when those three transfers occurred" pursuant to section 547(f)); *Lids Corp. v. Marathon Investment Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 540 (Bankr. D. Del. 2002) (section 547(f) insolvency applies). If defendant "fails to present evidence to rebut the [547(f)] presumption, [the Plaintiff] is entitled to rely on the presumption to establish that it was insolvent." *In re Lids Corp.*, 281 B.R. at 540; *see McColley v. Navaro Gem Ltd.*, 68 B.R. 588, 592 (Bankr. S.D.N.Y. 1986) (this presumption "requires the party against whom the presumption exists to come forward with some evidence to

5

rebut the presumption."); *Young v. Nadelson Displays, Inc. (In the Matter of Lucasa Int'l, Ltd.)*, 14 B.R. 980, 982 (Bankr. S.D.N.Y. 1981).

Defendant has offered no evidence to attempt to rebut the statutory presumption in section 547(f).  Further, DMC was actually insolvent at the time of the Transfer.  *See* Ex. P-1, Compl. ¶ 17.  Creditors have filed in excess of $15 million in claims against DMC.  *See* Ex. P-1, Compl. ¶ 16.  And the Trustee currently projects that creditors of DMC ultimately will recover approximately 20% of their allowed claim amounts.  Accordingly, section 547(b)(3) is satisfied.

(5)      Similarly, section 547(b)(4) is satisfied.  The Transfer was made on January 3, 2019, which is on or within 90 days prior to the Petition Date.  *See* Ex. P-5 (bank statement). Further, Defendant admitted the Transfer was made on or within 90 days before the Petition Date. *See* Ex. P-2, Admission No. 11.

(6)      The Transfer enabled Defendant to receive more than it otherwise would have if the Transfer had not been made and Defendant was limited to receiving a chapter 7 distribution. *See*  11 U.S.C. § 547(b)(5).  "As a practical matter, this element of a preference is almost always satisfied where a debtor transfers property to an unsecured creditor . . . and the creditor would receive less than 100% in a Chapter 7 liquidation."  *McColley*, 68 B.R. at 595; *see AFD Fund, et al. v. Transmed Foods, Inc. (In re AmeriServe Foods Distrib., Inc.)*, 315 B.R. 24, 32 (Bankr. D. Del. 2004).

Here, as discussed above, general unsecured creditors currently are projected to recover approximately 20% of their allowed claim amounts, while Defendant received 100% of the amount of the Transfer.  Thus, the Transfer enabled Defendant to receive more than it otherwise would have if the Transfer had not been made.

Accordingly, the Transfer is avoidable under section 547(b).

6

Bankruptcy Code section 550(a)(1) provides, in relevant part, that "to the extent that a transfer is avoided under section . . . 547. . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from— (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made . . . ." 11 U.S.C. § 550(a)(1). As discussed above, the Transfer was actually made to Defendant and cleared Defendant's bank account. *See* Stip. ¶¶ 12, 13, 14; Ex. P-2, Admissions No. 3, 4 & 5. Further, Defendant admits it was the initial transferee of the Transfer. *See* Ex. P-2, Admission No. 6. Accordingly, the Trustee is entitled to recover the Transfer from Defendant under section 550(a)(1).

In sum, the Trustee has satisfied each of the elements of his prima facie case to avoid and recover the Transfer from Direct Results under sections 547(b) and 550 of the Bankruptcy Code. The burden now shifts to Direct Results to prove it has a valid affirmative defense. 11 U.S.C. § 547(g). As discussed below, Direct Results has no defense.

## II.    Direct Results Cannot Establish an Affirmative Defense.

In its Answer, Defendant asserted a range of affirmative defenses, including, contemporaneous exchange, new value, statute of limitations, conduit, and ordinary course. Defendant has since abandoned several of these affirmative defenses and admits it does not have a contemporaneous exchange, subsequent new value, or statute of limitations defense. *See* Ex. P-2, Admissions No. 28, 29, 30, 36. The Trustee addresses Defendant's remaining asserted defenses.

### A.    Defendant Cannot Establish a Conduit Defense.

Defendant asserts that, of the $493,349.34 Transfer, it "retained for itself only $19,510.99 of the Check as its 3.5% commission per the Agreement." Stip. ¶ 20; *see* Ex. P-2, Admission No. 8. Even if this were true, it is irrelevant and does not support a defense.

7

As the Bankruptcy Code makes clear, section 547(b) authorizes the Trustee to avoid a "transfer." 11 U.S.C. § 547(b). A "transfer" includes, among other things, "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with— (i) property; or (ii) an interest in property." 11 U.S.C. § 101(54). The focus is on what the Debtor gave up and whether the "transfer diminished the Debtor['s] estate." *In re Hayes Lemmerz Int'l, Inc.*, 329 B.R. 136, 142 (Bankr. D. Del. 2005). Here, the Transfer diminished DMC's estate because $493,349.34 in cash was transferred out of DMC's bank account to Defendant and, therefore, those funds were not available for distribution to the creditor body as a whole.

Although Defendant refuses to admit it, Defendant is not a "conduit." To establish a conduit defense, Defendant must show it lacked "dominion and control" over the payment it received and that it lacked the capacity to use the money as it saw fit. *See U.S. Interactive v. Sampson Travel Agency, Inc. (In re U.S. Interactive)*, 321 B.R. 388, 395 (Bankr. D. Del. 2005) (rejecting conduit defense). "Courts have made it clear that to be a conduit, one cannot be a creditor and receive a payment to satisfy a debt—this is the 'hallmark' of a preferential transfer." *In re Lenox Healthcare, Inc.*, 343 B.R. 96, 105 (Bankr. D. Del. 2006).

Here, the Transfer was in payment of Defendant's Invoice. *See* Ex. J-2. The Invoice bears Defendant's letterhead and Defendant's payment details. *See* Ex. J-2. On the Invoice, there is no allocation of amounts to Defendant and amounts to any other party—on its face, the entire amount of the Invoice is payable to and for the benefit of Defendant. *See* Ex. J-2.

DMC paid the Invoice by the Check. *See* Ex. J-3. The Check was made payable to Defendant. *See* Ex. J-3. Defendant deposited the Check into its own checking account and the Check cleared that account. *See* Stip. ¶¶ 12, 13, 14; Ex. P-2, Admissions No. 3, 4 & 5. Defendant had dominion and control over the entire amount of the Transfer. While Defendant tries to make

8

something out of its assertion that it paid third party broadcasters, Defendant admits it paid those broadcasters <u>before</u> it deposited the Check and before the Transfer was made.  *See* <u>Ex. P-2</u>, Admission No. 35 ("Defendant admits that it paid the underlying third party broadcasters after receiving, **but prior to depositing the Check**.") (emphasis added).  As a result, any conduit defense fails as a matter of law.

**B.      The Transfer Was Not Made in the Ordinary Course of Business.**

Defendant asserts that the Transfer is protected by the ordinary course of business defense. Pursuant to section 547(c)(2), a transfer is not avoidable, "to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms."  11 U.S.C. § 547(c)(2).

Defendant has the burden of proving the Transfer was made in the ordinary course of business under either the subjective test under section 547(c)(2)(A) or the objective test under section 547(c)(2)(B).  11 U.S.C. § 547(g).  Defendant cannot satisfy its burden under either test.

**1.      Defendant Fails the Subjective Test under Section 547(c)(2)(A).**

In applying the subjective test, courts consider a number of factors, including:  "(1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition."  *In re AFA Inv. Inc.*, No. 12-11127, 2016 WL 908212, at *4 (Bankr. D. Del. Mar. 9, 2016) (internal citation and quotations omitted).

9

While no one factor is dispositive, "the timing of payments is of **particular importance**" and is often dispositive. *Id.* (citing cases) (emphasis added); *see, e.g., In re Quebecor World (USA), Inc.*, 491 B.R. 363, 369 (Bankr. S.D.N.Y. 2013) (stating that "a late payment is usually nonordinary" and holding that a payment made 91 days after the invoice date was not ordinary where historically the debtor paid the defendant's invoices on average 60 days after the invoice date); *In re TWA, Inc. Post Confirmation Est.*, 327 B.R. 706, 709 (Bankr. D. Del. 2005) ("payments made beyond the payment terms are considered as falling outside the ordinary course of business between the parties and are presumed to be non-ordinary" and rejecting defendant's ordinary course of business defense).

Here, the Transfer was not made in the ordinary course of business between DMC and Defendant. In particular, the Transfer was older than any comparable payment made during the historical period, Defendant intentionally held the Check for at least 30 days, Defendant engaged in unusual collection activities and pressure tactics, and Defendant sought to gain an advantage in light of the Debtors' deteriorating financial condition. Each of these grounds alone is sufficient for the Court to find that the Transfer was not made in the ordinary course of business. Collectively, they undercut any argument made by Defendant that the Transfer is not avoidable.

### a.    The Transfer Was Made Outside the Historical Range.

Attached hereto as Exhibit P-6 (the "Payment History") is a chart setting forth DMC's payment history with Defendant during the more than two years prior to the Petition Date. Defendant admitted that this chart "is a complete and accurate list of the payments received by Defendant from the Debtors during the period covered by the Payment History." Ex. P-2, Admission No. 12. While the Payment History contains both the invoice date and the "date invoice sent to Mercury," the Trustee disputes that Defendant has substantiated when the invoices were first sent to the Debtors. Notwithstanding, the Trustee's ordinary course of business analysis

10

includes the alleged invoice "sent" dates because, even assuming hypothetically that such "sent" dates are accurate, the Transfer is still not ordinary.

For the convenience of the Court, attached hereto as Exhibit P-7 (the "Payment History with Calculations") is a version of the Payment History in which three columns have been added: (i) column I, which lists the number of days between the payment received dates (column A) and the invoice dates (column F); (ii) column J, which lists the number of dates between the payment received dates (column A) and the dates that the invoices were allegedly sent to DMC (column G); and (iii) column K, which lists the number of dates that the checks cleared (column H) and the payment received dates (column A).

As reflected on the attached Payment History with Calculations, during the two-year period prior to the preference period, that is between December 25, 2016, and December 28, 2018 (the "Historical Period"), DMC paid 21 of Defendant's invoices (collectively, the "Historical Invoices"). *See* Ex. P-7. Defendant received payment of the Historical Invoices between 64 and 96 days after the date of each such invoice, with an average of 80.76 days to pay. *See* Ex. P-7.[2]

Importantly, because Defendant held the Check for 30 days or more before the Check was honored, the date the Check was honored, not the date on which Defendant received the Check, controls for purposes of an ordinary course of business defense under section 547(c)(2).

In *Barnhill v. Johnson*, 503 U.S. 393, 394-95 (1992), the United States Supreme Court clarified that, for purposes of 11 U.S.C. § 547(b), a transfer made by check is deemed to occur on the date the check is honored (i.e., the check clears the debtor's bank account). Notwithstanding that rule, some courts use the "date of delivery" for purposes of the ordinary course of business

---

[2] If, instead of using the date of delivery, the check clear dates are used to determine the number of days to pay during the Historical Period, the result is the same. Using the check clear date, the payments made during the Historical Period range from 65 to 101 days to pay with an average of 82.71 days. The Transfer is still not ordinary.

defense under section 547(c).  *See id.* at 402 n.9 (citing cases and "expressing no view on that issue").  This "date of delivery" rule is subject to a well-recognized exception that applies here.

Specifically, if a check is held for 30 days or more before it is honored, then the date the check is honored, not the date of delivery, controls for purposes of section 547(c).  As one court explained, "under § 547(c)(2) payment by check occurs on the date of delivery if the check is presented for payment within the 30 day period deemed reasonable by U.C.C. § 3-503(2) . . . and honored upon presentment. **Otherwise, the date of transfer is the date the check is honored**." *In re S. Indus. Banking Corp.*, 92 B.R. 297, 303 (Bankr. E.D. Tenn. 1988) (emphasis added).[3]

Many other courts have also recognized this 30-day exception to the general "date of delivery" rule under section 547(c)(2).  *See*, *e.g.*, *In re Continental Commodities, Inc.*, 841 F.2d 527, 530 (4th Cir. 1988) ("a transfer of funds by check is effective on the date that the creditor receives the check as long as the debtor's bank honors it within the 30-day requirement of U.C.C. § 3-503(2)."); *In re Wolf & Vine*, 825 F.2d 197, 202 (9th Cir. 1987); *In re White River Corp.*, 799 F.2d 631, 634 (10th Cir. 1986) ("the check must be presented for payment within 'the 30–day period deemed reasonable under the U.C.C.' and honored upon presentment in order for the delivery date to be considered the time of transfer."); *cf. O'Neill v. Nestle Libbys P.R., Inc.*, 729 F.2d 35, 38 (1st Cir. 1984) (using the check receipt date because "the checks in question were presented for payment within the 30-day period"); *cf. also Braniff Airways, Inc. v. Midwest Corp.*, 873 F.2d 805, 808 (5th Cir. 1989) (same).

The importance of this 30-day exception to the general "date of delivery" rule was addressed by the Ninth Circuit in *Wolf & Vine*:  If "a check transaction takes place when the check

---

[3] The court's citation to U.C.C. § 3-503(2) refers to the provision in effect at the time the decision was rendered, which provided in relevant part that a "reasonable time for presentment . . . of an uncertified check" was "thirty days after date or issue whichever is later . . . ."  U.C.C. § 3-503(2) (1988).

is delivered, regardless of when the check is honored and money is actually transferred, then sections 547(b) and (c)(2) can be **manipulated**." *Wolf & Vine* 825 F.2d at 202 (emphasis added).

Because Defendant intentionally held the Check for more than 30 days, the date that the Check was honored (January 3, 2019), and not the date that Defendant received the Check (December 3, 2018), is the operative date for purposes of determining whether Defendant can establish an ordinary course of business affirmative defense. *See Continental Commodities*, 841 F.2d at 530; *Wolf & Vine*, 825 F.2d 202; *In re White River Corp.*, 799 F.2d at 634; *Indus. Banking Corp.*, 92 B.R. at 303. Using the Check clear date, the Transfer occurred 130 days after the Invoice date, which is 34 days older than any payment made by DMC to Defendant during the Historical Period and is nearly 50 days older than the average days to pay during the Historical Period. *See* Ex. P-7. That is simply not ordinary.

In the alternative, and while the Trustee disputes the evidentiary basis for the asserted invoice "sent" dates advanced by Defendant, even if the invoice "sent" dates are used, the Transfer is still not ordinary. As set forth on the Payment History with Calculations, the Historical Invoices were paid between 28 and 74 days after the date on which Defendant claims it sent such Historical Invoices to DMC, with an average of 45.81 days to pay. *See* Ex. P-7. By contrast, and using the date on which the Check was honored, the Transfer was made 80 days after the date on which Defendant asserts the Invoice was sent. *See* Ex. P-7. Again, this is well outside the parties' historical course of dealings.

By any measure, the Transfer was far outside the parties' historical course of dealings and is not protected by the ordinary course of business defense.

Further, this is not a case where an innocent mistake—such as the proverbial check falling behind the desk—caused the more than 30 day delay between the Check receipt date and the

13

Transfer date.  Rather, Defendant <u>admits</u> it manipulated the timing of the deposit of the Check "for financial management and tax purposes," i.e., to avoid paying taxes on it.  The fact that Defendant intentionally held the Check for more than 30 days and did not hold any other check during the Historical Period demonstrates irrefutably that the Transfer was not ordinary.[4]

### b.    Defendant Pressured DMC and Took Advantage of its Financial Condition.

"[P]ayments made as a consequence of economic pressure and debt collection practices not common in the industry are not in the ordinary course of business."  *In re 360networks (USA) Inc.*, 338 B.R. 194, 210 (Bankr. S.D.N.Y. 2005) (rejecting ordinary course defense because of defendant's use of "various pressure tactics to induce the Debtors to pay invoices") (citing cases); *see In re AE Liquidation*, Inc., No. 08-13031 (MFW), 2013 WL 3778141, at *7 (Bankr. D. Del. July 17, 2013) (citing cases) ("Unusual collection activity between a debtor and creditor in the preference period can defeat an ordinary course defense.").

Here, the Transfer to Defendant was made as a result of pressure tactics employed by Defendant and, therefore, was not ordinary.

On its face, the Invoice was due on November 15, 2018.  *See* <u>Ex. J-2</u>.  The very next day, on November 16, 2018, a representative of Direct Results sent DMC an email stating, in part, "I haven't seen payment arrive for the attached invoice.  Do you have tracking info you can share?" *See* Email thread annexed hereto as <u>Exhibit P-8</u>.

---

[4]  Twenty of the 21 Historical Invoices were paid by check.  *See* <u>Ex. P-7</u>.  For those 20 Historical Invoices, all of the checks cleared between 1 days and 7 days after Defendant received the checks, with an average of just 2.05 days to clear.  *See* <u>Ex. P-7</u>.  For one of those Historical Invoices (No. 59636), payment was received on December 27, 2017 and the check cleared on January 3, 2018.  *See* <u>Ex. P-7</u>.  This check was received during the week between the Christmas and New Year's holidays and cleared shortly after the New Year.  The brief 7 day window between when that check was received and when it cleared does not prove that the check was intentionally held.  It also does not establish a pattern of Defendant holding checks at year end.  Moreover, even if the check was held for 7 days, that is inconsistent with the challenged Transfer, because the Check at issue here was held for at least 30 days before it cleared.  *See* <u>Ex. P-7</u>.

14

On November 26, 2018, that same representative of Direct Results sent DMC a follow up email stating, in part, "Do you have an update on the below?" Ex. P-8. The next day, on November 27, 2018, another representative of Direct Results sent DMC a further email stating, in part, "I think Dan is no longer at Mercury – can you help us with August payment for Financial Engines? Kelly has not responded.  Invoice due date was 11/15." Ex. P-8.  On November 28, 2018, a representative of DMC responded that payment of the Invoice was "Scheduled for 11/30." Ex. P-8.

On November 29, 2018, a representative of Direct Results replied to DMC, in part, "We need to speed that up.  We have stations to pay out by the end of the month once we receive funds. Please confirm that payment for the September invoice will go out no later than 12/14, the normal mid-month schedule." Ex. P-8.

Finally, on November 30, 2018, Defendant's pressure tactics bore fruit and DMC sent Defendant the Check.  *See* Ex. J-3.

Not content to simply receive the Check (which Defendant apparently intended to hold until January 2019), Defendant continued to pressure DMC to make other payments, and further took advantage of DMC's financial condition.  Among other things, on December 7, 2018, Jill Albert, Defendant's CEO, emailed a representative of DMC stating, "[w] Will you please let me know when payment will be processed. I appreciate you saying you will let us know when you find out but I don't want to repeat the late payment of last month.  I believe all discrepancies are cleared.  We need money in house next Friday, 12.14 to make station payments on time and avoid the calls from stations to client... as occurred last month." *See* Ex. P-8.

However, DMC did not make payment on December 14. *See* Ex. P-7.  Upon information and belief, Defendant kept up its pressure tactics and, on December 28, 2018, DMC made a

$664,980.17 electronic funds transfer to Defendant (the "Wire Transfer").  *See* Ex. P-7.  Although the Wire Transfer was made outside the preference period, the existence of the Wire Transfer is important:  The Wire Transfer shows Defendant's pressure tactics were successful in causing DMC to make multiple payments, including a payment by electronic funds transfer, whereas all prior payments had been made by check.   The Wire Transfer establishes that, in the run-up to the Petition Date, DMC had significantly deviated from the parties' historical course of dealings as a result of Defendant's pressure tactics.  *See* Ex. P-6 &  P-7.  And the Wire Transfer underscores that Defendant was willing to take advantage of DMC's deteriorating financial condition for its own benefit, and to the detriment of other creditors.  Indeed, less than a week after the Wire Transfer was made and the day after the Transfer was made, on January 4, 2019, the Debtors sold substantially all of DTR's assets relating to its long-form direct response business.  *See* Ex. P-1, Compl. ¶ 14.  The next week, on January 11, 2019, the Debtors sold substantially all of their assets relating to their short-form direct response and digital advertising media businesses.  *See id.* ¶ 15. Soon thereafter, DMC was forced into an involuntary chapter 7 bankruptcy on the Petition Date. *See id.* ¶ 8.

While Defendant took advantage of DMC's deteriorating financial condition and successfully pressured DMC into making the Transfer and the Wire Transfer, other creditors of DMC were left holding at least $15 million in unpaid claims, according to the official claims register maintained in these cases.  *See id.* ¶ 16.

Because Defendant was preferred over other similarly situated creditors, the Transfer represents precisely the kind of preferential payments that section 547(b) is designed to avoid.

**2.** **Defendant Fails the Objective Test under Section 547(c)(2)(B).**

Under the "objective" test of the ordinary course of business defense, courts consider whether the challenged transfer was "made according to ordinary business terms." 11 U.S.C. § 547(c)(2)(B). Ordinary business terms refers to "the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage." *In Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods. Inc.)*, 18 F.3d 217, 224, 228 (3d Cir. 1994) (affirming that defendant had "not placed sufficient evidence in this record to support a finding that the trade practices between [defendant] and the debtor comported with 'ordinary business terms.'").

A defendant must present sufficient evidence that the payment history between the creditor and debtor fits within the ordinary standards of the creditor's industry. *See U.S. Interactive*, 321 B.R. at 393-94. Courts will reject evidence that is "too general," is hearsay, or where the witness has "guessed." *Id.* at 393. "Instead, courts look for objective, definitive evidence supported by specific data to meet the burden of proof." *Id.* Indeed, in *U.S. Interactive*, the court rejected the defendant's ordinary course of business defense because "Defendant's expert did not present any statistics or other objective basis for his conclusions." *Id.* at 394.

Here, Defendant has not produced any expert report whatsoever, nor has Defendant produced any other relevant evidence to satisfy its burden of proving the Transfer was made according to ordinary business terms in Defendant's industry. *See* Ex. P-2, P-3 & P-4; *see also* 11 U.S.C. § 547(g).

Instead, Defendant asserts that it "waited to deposit checks received in November or December of prior years from the Debtors and other clients . . . ." Stip. ¶ 21 (factual dispute). First, as discussed above, there is no evidence that Defendant actually held checks from DMC in

17

prior years.  Second, the fact that Defendant may have held checks from other clients is irrelevant. Not only is that assertion not supported by any proof that Defendant made a practice of holding all checks, even if it did, that does not establish ordinary business terms <u>for the industry</u> as a whole. Indeed, no evidence has been produced that it is a standard practice in Defendant's industry to hold checks for at least 30 days for "financial management and tax purposes." *Id.*

Given the total lack of "objective, definitive evidence supported by specific data" about the industry standard, Defendant cannot establish an ordinary course of business defense under the objective test of section 547(c)(2)(B).

### 3. Defendant's Appeal to Equity Rings Hollow Given Its Own Inequitable Conduct.

Unable to establish any affirmative defense under section 547(c) or recognized in case law, Defendant appears to invite the Court to exercise its equitable powers not to order the avoidance and recovery of the Transfer.  Respectfully, the Court should decline any such invitation.

The bankruptcy court's equitable powers must be exercised within the confines of the Bankruptcy Code and a court may not rely on section 105(a) or its inherent powers to disregard the provisions of the Code.  *See Law v. Siegel*, 571 U.S. 415, 421 (2014) ("It is hornbook law that § 105(a) does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code.").  Here, as discussed above, the Trustee has established a prima facie claim to avoid and recover the Transfer.  Unless the Defendant can prove an affirmative defense, the Transfer must be avoided and recovered by the DMC estate for the benefit of its creditors. Defendant cannot rely on section 105(a) or a generalized plea to equity to override the clear and express terms of Bankruptcy Code sections 547 and 550.

Further, it is axiomatic that one "who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945).  This maxim

18

is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief . . . ." *Id.* It requires that one who seeks equity "shall have acted fairly and without fraud or deceit as to the controversy in issue." *Id.* at 814-15.

In this matter, Defendant's hands are not clean. As a result of its pressure tactics, Defendant received the $493,349.34 Transfer, representing 100% of the amount of its claim. As a further result of its pressure tactics, Defendant also received the $664,980.17 Wire Transfer just prior to the preference period. By contrast, general unsecured creditors of DMC are currently estimated to recover approximately 20% of their allowed claim amounts. It would be equitable to reward Defendant for its inequitable conduct by allowing Defendant to keep 100% of the Transfer when other similarly situated creditors will ultimately recover a fraction of what they are owed.

Even more troubling, Defendant admits it intentionally held the Check for more than a month until the first business day of January 2019 to avoid paying taxes on that money in 2018. Holding a check to avoid paying taxes would be a violation of federal tax laws and regulations. *See*, *e.g.*, 26 U.S.C. § 451(a) (2018) (stating the general rule that gross income must be included "for the taxable year in which received by the taxpayer"); 26 C.F.R. § 1.451-2 (stating that income is taxable in the year in which it is "constructively received" by the taxpayer); *Bright v. United States*, 926 F.2d 383, 387 (5th Cir. 1991) (holding that a check which the taxpayer received on December 27, 1985 "constituted taxable income in that year," not in 1986, because there were still five calendar days and at least two business days in which the check could have been deposited); *Millard v. Comm'r,* T.C. Memo 2005-192, 2005 WL 2078496 (U.S. Tax Court 2005) (holding that income was taxable in the year the taxpayer first received the check, not the year in which the

19

check was cashed).  Defendant's inequitable conduct in holding the Check for more than a month

for "tax purposes" should not be countenanced, let alone rewarded.

The Trustee respectfully submits there is no need to resort to equity in this matter.  The

Bankruptcy Code is clear:  The Transfer is avoidable under section 547(b) and is recoverable by

the Trustee under section 550(a)  Defendant has not, and cannot, satisfy its burden of proving any

affirmative defense.

## III.    CONCLUSION

For all of the foregoing reasons, the Trustee asks the Court to enter judgment in his favor

avoiding and recovering the Transfer in the amount of $493,349.34 and awarding the Trustee costs,

pre- and post-judgment interest, and such other relief as is good and proper.

Dated:  August 19, 2022                                       **ARCHER & GREINER, P.C.**

_/s/ Bryan J. Hall_
David W. Carickhoff (No. 3715)
Bryan J. Hall (No. 6285)
300 Delaware Ave., Suite 1100
Wilmington, DE 19801
(302) 777-4350
(302) 777-4352 (fax)
dcarickhoff@archerlaw.com
bjhall@archerlaw.com

_Attorneys for the Chapter 7 Trustee_

225160923

20